Benjamin B. Goldman and Ethel I. Goldman, Husband and Wife v. Commissioner.
Goldman v. Commissioner
Docket No. 83567.
United States Tax Court
T.C. Memo 1962-36; 1962 Tax Ct. Memo LEXIS 274; 21 T.C.M. (CCH) 181; T.C.M. (RIA) 62036; February 23, 1962
*274 Petitioner, engaged in the real estate business, had a trust wholly controlled by him purchase an industrial building for the purpose of renting part of it to his son's manufacturing corporation. Held, loans made by petitioner to help his son's faltering corporation business were not business loans of petitioner and are not deductible as business bad debts. Charles J. Isber, Esq., 209 Washington St., Boston, Mass. for the petitioners. Norton L. Armour, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined a deficiency in the petitioners' income tax liability for the year 1956 in the amount of $8,451.63. The issues are (1) whether petitioners are entitled to a business bad debt deduction in *275 1956 in the amount of $22,444.03, and (2) whether they received certain additional income from Jeds Realty Trust in that year. Findings of Fact Some of the facts were stipulated and they are hereby included by this reference. Benjamin B. Goldman and Ethel I. Goldman, husband and wife, are residents of Allerton, Massachusetts. They filed a joint income tax return for 1956 with the district director of internal revenue for the district of Massachusetts at Boston. Benjamin will hereinafter be called the petitioner. Petitioner has been a dealer in real estate for 23 years. On June 25, 1953 petitioner and his wife created a trust called Jeds Realty Trust with themselves as trustees. Their three children were named in the trust instrument as the beneficiaries of the trust, with each to receive a one-third interest in the income and a one-third interest in the corpus. The trustees had the right to terminate the trust at any time. At the time the trust instrument was executed the named beneficiaries executed releases of their interests under the trust. Petitioner created this trust for the purpose of purchasing and holding title to a factory building, and this has been the only property *276 held by the trust. The 1956 fiduciary income tax return filed by the trust listed petitioner and his wife as sole beneficiaries of the trust income. In 1953 the Jeds Realty Trust purchased an unoccupied factory building in Lawrence, Massachusetts for $65,000. On October 24, 1951 the petitioner's son, Paul R. Goldman, organized Lawrence Plycraft, Inc. under the laws of the State of New Hampshire to engage in the manufacture of plywood outboard motor boats covered with fiberglass. The corporation's place of business was in Lawrence, Massachusetts, where it rented space for its operations and its stock was wholly owned by Paul. When the Jeds Realty Trust purchased the unoccupied factory building in 1953, petitioner was considering his son's corporation as a tenant. Early in 1954 Lawrence Plycraft, Inc. became a tenant of the building and in 1955 a second tenant moved in. These two tenants completely occupied the building. The annual rental from Lawrence Plycraft, Inc. was $11,000 but by 1955 the corporation was paying practically no rent. In 1952 and 1953 Lawrence Plycraft, Inc. made "nominal" profits, but by 1955 the corporation's business was deteriorating. From 1954 through 1956 *277 the corporation borrowed money from petitioner, from Jeds Realty Trust and from David Realty, Inc. of Boston, a corporation wholly owned by petitioner and his wife. Petitioner's series of advances to or for the benefit of Lawrence Plycraft, Inc. were on open account with no promissory notes or other written evidence of the advances. The advances were made regularly and they ranged from a few hundred dollars to several thousand dollars. These advances were made by check, sometimes payable to the corporation, sometimes to its creditors, and sometimes payable to cash for payroll and other purposes. Lawrence Plycraft, Inc. repaid some of the advances by assigning accounts receivable and certain fire insurance proceeds to petitioner. In 1956 the petitioner's accountant attempted to ascertain the amount of the petitioner's advances to Lawrence Plycraft, Inc. and by examining the corporation's books and petitioner's cancelled checks and check stubs, and by questioning petitioner, the accountant, after some correction entries, reconstructed the open account. In September or October 1954 Lawrence Plycraft, Inc. gave a chattel mortgage in the amount of $15,500 to one Samuel G. Camann, and *278 this mortgage was assigned in June 1956 to David Realty, Inc. of Boston. In June 1956 a chattel mortgage in the amount of $77,357.30 was given by Lawrence Plycraft, Inc. to David Realty, Inc. of Boston, to petitioner and his wife as trustees of Jeds Realty Trust, and to petitioner and his wife individually. The mortgage was to secure the advances made to Lawrence Plycraft, Inc. over the prior period of time. On November 3, 1956 the various mortgagees foreclosed on both of the chattel mortgages outstanding against Lawrence Plycraft, Inc. The property covered by the $15,500 mortgage was bid in by David Realty, Inc. for $5,000, while the property covered by the $77,357.30 mortgage was bid in by the various mortgagees for $20,000. Lawrence Plycraft, Inc. went into bankruptcy in November 1956. Subsequently, Plycraft, Inc., a corporation wholly owned by petitioner and his wife, was formed and it continued operations on the same premises, using most of the machinery of the old corporation. Petitioner's son, Paul, was president and general manager of the new corporation. In the 1956 joint income tax return filed by petitioner and his wife a deduction was claimed for a business bad debt *279 loss of $22,444.03, with the explanation "Business Loan, chattel Mortgage (to Lawrence Plycraft, Inc.) 1954/56 * * *. Foreclosure (Sheriff's Auction)." In the fiduciary income tax return for 1956 filed by Jeds Realty Trust, a deduction was claimed in the amount of $5,193.10, with the explanation "Loss on Lawrence Plycraft, Inc. (tenant, forclosure [sic], Sheriff's auction 11/3/56)." Respondent in his statutory notice of deficiency disallowed the deduction of $22,444.03 and also determined that petitioner and his wife "received additional distributable income from Jeds Realty Trust in the amount of $11,877.06 in the year 1956" arising from respondent's disallowance of (1) a loss carry-over deduction claimed by the Trust in the amount of $6,683.96 and (2) the business bad debt loss claimed by the Trust of $5,193.10 for advances made to Lawrence Plycraft, Inc. Petitioner admitted in his petition that the $6,683.36 carry-over loss deduction was not deductible, thus increasing to that extent his distributable income from the trust. Opinion Respondent argues (1) that petitioner has not established the amount of his loss; (2) that the record does not show that petitioner's loans to *280 Lawrence Plycraft, Inc. became worthless in 1956; and (3) that the loans, even if worthless in 1956, do not qualify as business bad debts within the meaning of section 166 of the Internal Revenue Code of 1954. It is true that the evidence as to the precise amount of the advances made by petitioner to his son's corporation over the years is not too satisfactory. Loans to the corporation were not only made by petitioner individually but also by David Realty, Inc. of Boston, a corporation wholly owned by petitioner and his wife, and by petitioner as trustee for Jeds Realty Trust. All of these loans were on open account on the books of Lawrence Plycraft, Inc. Petitioner's accountant testified that these books were in "muddle" and that he was forced to reconstruct the status of the open account by using cancelled checks, check stubs and other data and by questioning petitioner or the bookkeeper for Lawrence Plycraft, Inc. There are other uncertainties as to the precise amount claimed by petitioner as a bad debt loss. At the trial the petitioner's accountant testified how he computed the bad debt loss of $22,444.03. He explained it consisted of (1) the loan account *281 on the books in the amount of $17,223.94 and (2) a loss on a mortgage of $5,220.09. This mortgage seems to be the one given by Lawrence Plycraft, Inc. in 1954 to one Camann and which was assigned in 1956 to David Realty, Inc. of Boston. David Realty, Inc. foreclosed on this mortgage in 1956, so it is not clear how petitioner can treat the loss on the mortgage as his own. We are satisfied, however, that the petitioner did make loans to his son's corporation in an amount not exceeding $17,223.94. Petitioner continued to make loans to the corporation during 1956. During 1956 the corporation continued in business and at various times assigned accounts receivable to petitioner in repayment of the loans, so it cannot be said that such loans became worthless prior to 1956. However, the corporation went into bankruptcy in November 1956 and in that same month the various mortgagees foreclosed on the outstanding chattel mortgages. We believe these events clearly establish the worthlessness in 1956 of petitioner's loans to the corporation. But we do not believe these loans qualify as business debts. To be deductible as a business bad debt under section 166, the debt must have been proximately *282 related to the taxpayer's trade or business. Aubrey S. Nash, 31 T.C. 569. The question is one of fact. Petitioner admitted at the trial that he was not in the money-lending business, and it is obvious from the record that he was not in the business of promoting and financing corporations. He testified that he was a licensed dealer in real estate for more than 20 years, that he owned "quite a few houses" and that until about 1957 he owned some property in Florida. He purchased an unoccupied factory building in 1953 through a trust formed for that very purpose and he testified that he had his son's corporation in mind as a tenant at the time of the purchase. The corporation moved into the building early in 1954. To show that the loans were proximately related to his real estate business, the petitioner testified that his purpose for making the long series of loans to Lawrence Plycraft, Inc. was "[because] I wanted to keep the building occupied" and "[because] I could then sell it and get more money than I paid for it." Even if the record showed that this was the purpose for the loans, we seriously doubt that the uninterrupted financing of a tenant over a period of *283 years would be incidental to and proximately related to the business of a dealer in real estate. However, the record does not support petitioner's contention and, in fact, strongly supports a contrary conclusion. Petitioner admitted he had his son's corporation in mind when he purchased the building, and it appears that soon after the corporation became a tenant it practically ceased paying rent. If his purpose was to keep the building occupied, it is not explained why petitioner thought it essential to advance these substantial sums to keep his son's corporation as a tenant rather than seek another tenant for his building. Indeed, the record shows that a second tenant did occupy the rest of the building in 1955 at an annual rental of $4,200, and presumably a rentpaying tenant could just as easily have been found to replace his son's corporation. It is also significant that petitioner, or the trust controlled by him, still owned the building at the time of the trial and that the corporate successor to Lawrence Plycraft, Inc. was still a tenant. There is a strong inference in all this that the petitioner purchased the building largely as an accommodation to his son's business and the *284 loans were to further his son's business and not his own real estate business. In short, we believe the record establishes that these loans made by petitioner to Lawrence Plycraft, Inc. were not proximately related to petitioner's real estate business but were motivated by the personal desire to help his son in his faltering business. This case is somewhat like D. G. Bradley, 26 T.C. 970, where the taxpayer, engaged in the real estate business, rented a vacant store in his building to his nephew and loaned him $10,000 on a chattel mortgage to start in business. We held the loan "was not incidental or proximately related to the business of the taxpayer" and denied a business bad debt deduction. We hold that the petitioner is not entitled to a business bad debt deduction in 1956 on account of the worthlessness of his loans to the corporation but is entitled only to nonbusiness bad debt deduction within the limitation of section 166 (d). Petitioner does not make any separate argument on brief on the issue concerning the petitioner's distributable net income from Jeds Realty Trust. This increase arose from respondent's disallowance of a business bad debt deduction claimed *285 by the Trust in its 1956 fiduciary return for worthless loans made to Lawrence Plycraft, Inc. In view of petitioner's failure to argue the issue on brief, we deem the issue to be abandoned by him. In any event, the discussion above is applicable with equal force to the nature of the loans made by the Trust, which was controlled by petitioner and which held title to the factory building, to Lawrence Plycraft, Inc. We hold for the respondent on this issue. Decision will be entered under Rule 50.